STATE OF NORTH CAROLINA v. KENNETH BERNARD ROUSE

No. 120A92

(Filed 30 December 1994)

**1. Jury §§ 223, 226 (NCI4th)— capital trial—propriety of excusing juror for capital punishment views—refusal to permit questioning by defendant**

The trial court did not abuse its discretion in determining that a prospective juror's death penalty views would prevent or substantially impair her from performing her duties as a juror in a capital trial where the juror's entire voir testimony reveals that she had religious beliefs or scruples against capital punishment which caused her to "lean toward not believing in the death penalty"; she responded "I think I would" when asked whether she would automatically vote against the death penalty; she later stated that she didn't believe she "could vote for the death penalty"; and when asked whether her feelings toward the death penalty would "prohibit or foreclose" her from considering the death penalty, she responded, "I think it would." Furthermore, the trial court did not err by excusing the juror for cause without permitting defendant to question her about her ability to impose the death penalty where the record does not indicate that the juror would have responded differently to the dispositive questions had defendant questioned her.

**Am Jur 2d, Jury § 290.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**2. Jury § 261 (NCI4th)— capital case—peremptory challenge—death penalty reservations—no racial motivation**

The trial court's finding that the prosecutor's peremptory challenge of a black prospective juror in a capital trial was not racially motivated was not clearly erroneous where the prosecutor stated that the juror was challenged because she had reservations about imposing the death penalty; the juror's responses to the prosecutor's questions show that she may have had some reservations about capital punishment which could have affected her decision whether to recommend a sentence of death; even though some of the juror's answers indicated that she could vote

STATE v. ROUSE

[339 N.C. 59 (1994)]

for imposition of the death penalty depending on the evidence, the prosecutor, based on the entire voir dire of the juror, may have had a legitimate "hunch" that her reservations toward the death penalty would affect her sentencing decision; and the record shows that the prosecutor's peremptory challenge of this juror was not inconsistent with his other peremptory challenges.

Am Jur 2d, Jury §§ 233 et seq.

Proof as to exclusion of or discrimination against eligible class or race in respect to jury in criminal case. 1 ALR2d 1291.

Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.

Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.

3. Evidence and Witnesses § 1728 (NCI4th)— exclusion of portion of videotape—failure to object—no plain error

The trial court did not commit plain error in the exclusion without objection of a portion of a police videotape depicting a box behind the door of a convenience store storage room where defendant and the victim's body were found, although defendant contended that this evidence rebutted the State's evidence that defendant was found hiding behind the door and thus acknowledged wrongdoing, where defendant failed to show that the exclusion of this evidence likely affected the outcome of his trial.

Am Jur 2d, Evidence §§ 981 et seq.

Admissibility of videotape film in evidence in criminal trial. 60 ALR3d 333.

4. Criminal Law § 1314 (NCI4th)— capital sentencing— expert testimony—ability to adjust to prison life—mitigating evidence

The trial court erred by refusing to permit a forensic psychiatrist who had conducted an intense investigation into defendant's mental health to state his opinion in a capital sentencing hearing that defendant would adjust well to prison life since such testimony was proper evidence in mitigation. However, this error was harmless beyond a reasonable doubt where (1) this witness was

thereafter permitted to state his opinion that defendant makes his best adjustments in structured and supervised situations, and (2) defendant's other mental health expert was permitted to state his opinion that defendant will adjust well to the discipline and regulation of prison life.

**Am Jur 2d, Criminal Law §§ 598, 599.**

5. **Criminal Law § 172 (NCI4th)— capital sentencing—suicide gesture by defendant—denial of mental exam—hearing on capacity to proceed—substantial compliance with statute**

The trial court acted within its discretion under N.C.G.S. § 15A-1002(b)(1) in denying defense counsel's request for a psychological examination of defendant after defendant broke the glass in the door of his holding cell and cut his wrists during a recess in his capital sentencing proceeding where defendant's own expert witness had previously testified that he was competent to stand trial, and the only additional evidence before the court was defendant's suicide gesture. Nor did the court violate N.C.G.S. § 15A-1002(b)(3) by failing to conduct a hearing on defendant's capacity to proceed where defendant never requested a hearing to determine capacity but merely requested that defendant be examined, and there were no new circumstances before the court genuinely calling into question defendant's capacity to proceed. Even if a hearing were required, the trial court substantially complied with N.C.G.S. § 15A-1002(b)(3) where the court called two witnesses to testify to their knowledge of defendant's actions in the holding cell and his physical condition prior to ruling that defendant was competent to proceed; the court had heard considerable testimony by defendant's two mental health experts relating to defendant's mental condition; one expert had testified that defendant was competent to stand trial and that defendant had in the past engaged in suicide gestures aimed at diverting attention or eliciting sympathy; and the court asked whether defendant wanted to introduce evidence but defendant declined.

**Am Jur 2d, Criminal Law §§ 95 et seq.**

6. **Criminal Law § 1349 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances submitted—waiver of error**

Defendant waived any error with respect to the nonstatutory mitigating circumstances submitted by the trial court in a capital

STATE v. ROUSE

[339 N.C. 59 (1994)]

sentencing proceeding by expressing approval to the trial court of the nonstatutory mitigating circumstances submitted and failing to express any objection to those circumstances upon invitation by the trial court. N.C.G.S. § 15A-1443(c).

**Am Jur 2d, Criminal Law §§ 598, 599.**

7. **Criminal Law § 454 (NCI4th)— capital sentencing—jury arguments about death penalty—no impropriety**

The prosecutor did not improperly express his opinion in a capital sentencing proceeding that defendant should receive the death penalty, did not improperly argue matters outside the record, and did not improperly suggest that the jury was an instrument of the State when he argued that defendant was one of the most brutal, vicious murderers in Randolph County, asked whether any murder was ever sufficient to call for the death penalty "if this isn't one," and stated that the victim's family, a detective and the prosecution had "put faith in you" and "believe you'll do the right thing."

**Am Jur 2d, Trial §§ 567 et seq., 572 et seq., 648 et seq., 664 et seq.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

8. **Criminal Law §§ 433, 455 (NCI4th)— capital sentencing— jury argument—death penalty as deterrence—characterizations of defendant**

It was not improper for the prosecutor to urge the jury to recommend the death penalty in order to deter the defendant from killing again, and the prosecutor's statements that "it's not too late in saving some officers from seeing any other person in this condition" and that the crime was not a "one-shot deal" or a "one-shot robbery" were permissible. Furthermore, the prosecutor's statements describing defendant as a "maniac," a "mean, cold-blooded killer" and a "violent murderer" were not grossly improper as they were fair characterizations of defendant based on the brutality of the crime and were aimed at the penalty sought by the State.

**Am Jur 2d, Trial §§ 572 et seq., 681, 682.**

STATE v. ROUSE

[339 N.C. 59 (1994)]

Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial—modern cases. 88 ALR4th 8.

Propriety, under Federal Constitution, of evidence or argument concerning deterrent effect of death penalty. 78 ALR Fed. 553.

9. **Criminal Law § 454 (NCI4th)— capital sentencing—jury argument—mere sympathy**

The prosecutor could properly discourage the jury in a capital sentencing proceeding from having its decision affected by mere sympathy not related to the evidence in the case.

Am Jur 2d, Trial §§ 572 et seq.

Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or consitute denial of fair trial. 40 L. Ed. 2d 886.

10. **Criminal Law § 452 (NCI4th)— capital sentencing—jury argument—mitigating circumstances—no impropriety**

The prosecutor's arguments in a capital sentencing proceeding that certain mitigating circumstances do not "lessen this" communicated to the jury only that the mitigating circumstances did not exist or that the jury should not give those circumstances any mitigating value and could not have caused the jury mistakenly to believe that mitigating circumstances reduced the conviction to second-degree murder. Furthermore, the prosecutor's statement that the mitigating circumstance that "defendant was under the influence of a mental or emotional disturbance" was the same as the circumstance that defendant's capacity "to appreciate the criminality of his conduct [or] to conform his conduct to the requirements of the law was impaired" could not have confused the jury where the jury found one circumstance and rejected the other.

Am Jur 2d, Trial §§ 572 et seq.

Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or consitute denial of fair trial. 40 L. Ed. 2d 886.

**11. Criminal Law § 454 (NCI4th)— capital sentencing—jury argument—Biblical references—no gross impropriety**

There was no gross impropriety in the prosecutor's brief Biblical references in his jury argument in a capital sentencing proceeding where his statements were to the effect that the Bible contained arguably conflicting provisions regarding capital punishment and that it was the jury's role to determine defendant's fate depending solely on the law.

**Am Jur 2d, Trial §§ 572 et seq.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or consitute denial of fair trial. 40 L. Ed. 2d 886.**

**12. Criminal Law § 426 (NCI4th)— capital sentencing—jury argument—defendant falling asleep after arrest—no comment on defendant's silence**

The prosecutor's statements in his jury argument in a capital sentencing proceeding about defendant's lack of remorse shown by his falling asleep after his arrest were not improper comments on defendant's silence after being given the *Miranda* warnings but were clearly directed toward showing the jury a broader picture of what defendant did after his arrest in order to convince the jury that it should afford no mitigating value to the submitted mitigating circumstance that defendant "cooperated with law enforcement officers to the extent of physically responding to the directions of law enforcement officers."

**Am Jur 2d, Trial §§ 577 et seq.**

**Violation of federal constitutional rule (*Griffin v. California*) prohibiting adverse comment by prosecutor or court upon accused's failure to testify, as constituting reversible or harmless error. 24 ALR3d 1093.**

**13. Criminal Law § 427 (NCI4th)— capital sentencing—jury argument—avoidance of responsibility—no comment on assertion of silence at trial**

The prosecutor's statements in his jury argument in a capital sentencing proceeding to the effect that defendant had a pattern of denying and avoiding responsibility and that "We're here today, the same situation. Only this time he's not doing it, he's got every-

body else to do it for him" was not an improper comment on defendant's assertion of his right to silence at trial since the overall gist of the prosecutor's comments was that defendant was trying to avoid responsibility for his actions by means of his psychiatric experts. To the extent that the prosecutor's statements could have been interpreted as comments on defendant's silence, they were not grossly improper since there was no "extended reference" to defendant's silence.

**Am Jur 2d, Trial §§ 577 et seq.**

**Violation of federal constitutional rule (*Griffin v. California*) prohibiting adverse comment by prosecutor or court upon accused's failure to testify, as constituting reversible or harmless error. 24 ALR3d 1093.**

14. **Criminal Law §§ 1339, 1345 (NCI4th)— capital sentencing—two aggravating circumstances—submission of both not based on same evidence**

The trial court did not improperly submit two aggravating circumstances based on the same evidence in a capital sentencing hearing when it submitted the circumstance that the murder was especially heinous, atrocious, or cruel and the circumstance that the murder was committed during the course of the felonies of armed robbery and attempted first-degree rape since the evidence establishing the first circumstance concerned the brutality of the murder, none of this evidence was necessary to establish the felonies used for the circumstance that the murder was committed during the course of another felony, and there was substantial other evidence supporting that circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

**15. Criminal Law § 1320 (NCI4th)— capital sentencing—submission of two mitigating circumstances—failure to instruct not to consider same evidence—no plain error**

The trial court did not commit plain error by failing to instruct the jury in a capital sentencing proceeding *ex mero motu* that it should not consider the same evidence for both the heinous, atrocious, or cruel and commission of the murder during the course of other felonies aggravating circumstances because defendant failed to show that any error in the trial court's failure to so instruct likely affected the outcome of the trial in light of the severity of the murder, including the multiple stab wounds and the victim's suffering, and the fact that there was independent evidence supporting each aggravating circumstance.

**Am Jur 2d. Trial §§ 1441 et seq.**

**16. Criminal Law § 1355 (NCI4th)— capital sentencing—mitigating circumstance—no significant criminal history—insufficient evidence**

Evidence that defendant's blood alcohol level was .19 at the time of an accident, that he lost his driver's license, that defendant resisted arrest after a suicide attempt, and that defendant used illegal drugs over a number of years did not require the trial court to submit the mitigating circumstance of "no significant history of prior criminal activity" where the references to prior criminal activity were cursory and unsubstantiated and were elicited in contexts which the jury would not have considered as bearing on this mitigating circumstance or on defendant's character.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**17. Criminal Law § 1325 (NCI4th)— capital sentencing—consideration of mitigating circumstances—instructions using "may"**

The jury in a capital sentencing proceeding was not given the discretion to disregard mitigating circumstances found in Issue Two by the trial court's pattern instruction on Issue Three, whether the mitigating circumstances found by one or more of the jurors are insufficient to outweigh the aggravating circumstances found, and its instruction on Issue Four, whether the aggravating circumstances found are sufficiently substantial to call for imposition of the death penalty when considered with the

mitigating circumstances, that each juror "may consider any mitigating circumstance or circumstances that the juror determines exists by a preponderance of the evidence in Issue Two" where other provisions of the pattern jury instructions made it clear that a juror was required to consider any mitigating circumstance that juror found to exist in Issue Two.

Am Jur 2d, Trial §§ 1441 et seq.

18. **Criminal Law § 1325 (NCI4th)— capital sentencing—consideration of mitigating circumstances—instructions—use of "should" and "would"**

The trial court did not err by instructing the jury on Issue Two in a capital sentencing proceeding, whether certain submitted mitigating circumstances existed, that the jury "should" consider whether a circumstance existed and that it "would" find that circumstance if the evidence supported it and if, with respect to nonstatutory circumstances, it had mitigating value, rather than instructing that it "must" give such consideration, since the clear import of the court's instruction was that the jury had a duty to consider each mitigating circumstance submitted.

Am Jur 2d, Trial §§ 1441 et seq.

19. **Criminal Law § 1363 (NCI4th)— capital sentencing—consideration of other mitigating circumstances—instructions—use of "may"**

The trial court did not err by instructing the jury in a capital sentencing proceeding that it "*may* consider any other circumstance or circumstances arising from the evidence which you deem to have mitigating value."

Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.

20. **Criminal Law § 1360 (NCI4th)— capital sentencing—impaired capacity mitigating circumstance—instructions — erroneous statement—no plain error**

Although the trial court's statement in its instructions on the impaired capacity mitigating circumstance that the jury would have to find that defendant suffered from a personality disorder and had consumed alcohol and cocaine before the killing in order to find the existence of this circumstance may have been misleading when considered in isolation, this statement was not

plain error in light of the trial court's entire impaired capacity instruction which did not require defendant to establish both a personality disorder and intoxication in order for the jury to find this circumstance, the jury's finding that defendant was under the influence of an emotional disturbance, and the brutality of the killing, since any error in this one statement of the instruction had no probable effect on the outcome of the sentencing proceeding.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**21. Criminal Law § 1362 (NCI4th)— capital sentencing—age of defendant—conflicting evidence—determination of mitigating value—proper instruction**

Unless a defendant's age has mitigating value as a matter of law, a juror need consider defendant's age as mitigating only if that juror finds by a preponderance of the evidence that defendant's age has mitigating value. Thus, where the evidence was contradictory as to whether defendant's age had mitigating value, the trial court properly instructed the jurors that it was within their province to determine whether defendant's age had mitigating value.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.**

**22. Criminal Law § 1354 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances—uncontradicted evidence—finding of mitigating value not required**

Since the jury could reject any of the submitted nonstatutory mitigating circumstances on the basis that they had no mitigating value, defendant is not entitled to a new capital sentencing proceeding on the basis of the jury's rejection of certain nonstatutory mitigating circumstances even if those circumstances were supported by substantial, credible, and uncontradicted evidence.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**23. Criminal Law § 1360 (NCI4th)— capital sentencing— impaired capacity mitigating circumstance—uncontradicted evidence—rejection by jury**

Although testimony by defendant's two mental health experts in support of the impaired capacity mitigating circumstance was uncontradicted and would have supported a finding by the jury that the circumstance existed, the jury could reject this circumstance on the ground that it did not find the evidence of the mental health experts credible or convincing. A capital sentencing jury is not required to accept the existence of any particular statutory or nonstatutory mitigating circumstance because the evidence of that circumstance is uncontradicted.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**24. Criminal Law § 1349 (NCI4th)— capital sentencing—statutory mitigating circumstances—directed verdict**

A defendant may be entitled to a directed verdict on the existence of a statutory mitigating circumstance if the evidence in support of the circumstance is substantial, manifestly credible and uncontradicted.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**25. Criminal Law § 1373 (NCI4th)— first-degree murder— death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, where the jury found as aggravating circumstances that the murder was heinous, atrocious or cruel and that it was committed during the commission of the felonies of attempted rape and attempted armed robbery; the jury found defendant guilty based on felony murder and premeditation and deliberation; and the evidence showed that defendant stabbed the victim at least seventeen times with a butcher knife; the butcher knife remained in the victim's neck up to the handle; the victim had numerous bruises and several veins and arteries were severed; the victim suffered some fifteen minutes in this condition; and the victim was found lying in a pool of her own blood.

STATE v. ROUSE

[339 N.C. 59 (1994)]

**Am Jur 2d, Criminal Law § 628**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

Justice MEYER concurs in the result.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment sentencing defendant to death entered by Johnson (E. Lynn), J., at the 9 March 1992 Criminal Session of Superior Court, Randolph County. Motion to bypass Court of Appeals as to defendant's non-capital convictions allowed 16 March 1993. Heard in the Supreme Court 7 December 1993.

*Michael F. Easley, Attorney General, by Mary Jill Ledford, Assistant Attorney General, for the State.*

*Andrew O. Whiteman, Robin Adams Anderson, and John R. Rittelmeyer for defendant-appellant.*

EXUM, Chief Justice.

On 22 April 1991 defendant was indicted for first-degree murder and armed robbery of Hazel Colleen Broadway; on 6 January 1992 he was indicted for first-degree rape of Broadway. He was tried on all charges on 9 March 1992. On 23 March 1992 a jury found him guilty of first-degree murder on theories of premeditation and deliberation and felony murder. It also found him guilty of robbery with a dangerous weapon and attempted first-degree rape. At the sentencing proceeding the jury, after hearing additional evidence, recommended the death penalty. Defendant was then sentenced to death for first-degree murder, forty years imprisonment for armed robbery, and twenty years for attempted first-degree rape.

I.

The State's evidence at the guilt-innocence proceeding showed as follows:

On 16 March 1991, a Saturday, at 10:30 p.m. Andrew Surratt entered a convenience store, The Pantry, in Asheboro, and noticed that a cigarette stand was knocked over and that cigarettes were scattered about the floor. He called out for the clerk but heard no response. He left and called the police from a pay phone nearby.

STATE v. ROUSE

[339 N.C. 59 (1994)]

Several officers soon arrived at The Pantry. Officer Mark Hinshaw of the Asheboro Police Department responded to the call and arrived at The Pantry at 10:39 p.m. He checked the aisles and found nothing suspicious. He heard a muffled sound coming from a storage room. He and Sergeant York, who had arrived at the scene, entered the room where they found defendant against a wall. Hinshaw aimed his gun at defendant, and defendant said, "I ain't got nothing, man."

Defendant had blood on him, especially on the front of his shirt, his pants, his hands, his waist, his legs and his underwear. There were abrasions on his knees. His pants were unzipped but fastened at the top. His belt was hanging off. Hinshaw ordered defendant to freeze and pinned him behind the door. Defendant was then handcuffed and taken out of the room. Lieutenant Charles Bulla searched defendant in the store and found in defendant's pocket three rolls of pennies in a plastic container. Defendant was then taken away. Defendant did not resist the officers at this or any time. No odor of alcohol was found on defendant's breath.

On the floor of the storage room was Hazel Colleen Broadway, lying in a pool of blood. She tried to tell Hinshaw something but soon died. Broadway was covered in blood. There were handprints on her body. She was wearing a blouse, and her pants had been pulled down to her feet. Paramedics who had arrived at the scene removed her smock in an attempt to apply cardioelectrodes to her body, at which time they noticed a knife in Broadway's neck. The blade part of the knife was bent in a ninety-degree angle just below the handle.

More officers soon arrived at the scene who surveyed the store and collected evidence. The store was in disarray. A cigarette stand was overturned, and cigarettes were strewn about the floor. The cash register was turned sideways. Two empty rolls for pennies were on the floor. There was some other debris on the floor beside a trash can and some other penny rolls which seemed to have been knocked out of the safe. The bar stool behind the cash register had some blood on it. There were also spots of blood near the cash register.

Forensic serologist Lucy Milks concluded that the blood on defendant's hands, shirt and underwear was consistent with samples of blood taken from the victim. The blood on his pants was not. She found no spermatozoa in the vaginal, rectal or oral smears of the victim. She also did not find semen on the victim's clothing. Forensic chemist Glenn Parham tested defendant for the presence of drugs but found none.

**STATE v. ROUSE**

[339 N.C. 59 (1994)]

Debra L. Radisch, Associate Chief Medical Examiner of North Carolina, concluded that the victim died as a result of blood loss caused by a stab wound to the left neck, severing the carotid artery and jugular vein. A person could live ten to fifteen minutes after being stabbed in that location. In addition to the lethal knife wound, there were numerous other wounds to the victim including bruises, stab wounds and abrasions to her neck, chest, stomach, arms, shoulders, thighs, knee, palm, thumb, back, and elbow. Many of these were consistent with a sharp cutting instrument. Other injuries were consistent with a blunt instrument. No injuries were found on the victim's genital and rectal areas.

Robert E. Neill of the SBI crime laboratory, an expert in hair examinations, found one pubic hair from a black person in the pubic combings taken from the victim. This hair was microscopically consistent with a sample taken from defendant. A pubic hair found on defendant's undershorts and a pubic hair found on defendant's pants originated from a white person and was microscopically consistent with the victim's hair. Five head hair fragments were found on the victim's thighs and six on her buttocks that originated from a black person. Defendant's pubic hairs were unique when compared to those of other black persons.

Defendant entered evidence relating to his mental condition. Defendant used his school records and testimony from his mother to show the following: Defendant had difficulty in school and was described as being slow. At age fourteen he was struck by a truck and sustained a head injury. Defendant failed the ninth grade and never returned to school. Tests showed his IQ to range between 59 and 80. He often became confused when his mother gave him various tasks, and he was often depressed. In 1983 he was admitted to a hospital for an overdose of Phenergan with Codeine; he was then referred to a mental health clinic. Later he was admitted to the hospital when he slashed his wrists.

Forensic psychiatrist Dr. Robert Rollins, Jr., testified that he diagnosed defendant as having organic personality disorder, which is denoted by impaired brain functioning. This disorder is associated with mood changes, poor impulse control, poor social relationships, suspiciousness and paranoia. Defendant has a history of substance abuse, especially crack cocaine and alcohol. He also diagnosed defendant with mixed personality disorder. As a result of defendant's disorders, he had impaired functioning, such as poor planning and judgment. On 16 March 1991, defendant's ability to make and carry

**STATE v. ROUSE**

[339 N.C. 59 (1994)]

out plans was impaired. Defendant's IQ tests show that he is between mentally retarded and low average.

On cross-examination it was revealed that Dr. Rollins spoke to defendant on two occasions for a total of 130 minutes. Defendant told Dr. Rollins that on the evening of 16 March 1991 he was using crack cocaine and alcohol. In a report from 1987 defendant indicated that he could make his own decisions and that he was working full time. Rollins characterized defendant's suicide incidents as "gestures," noting that they occurred after family arguments and that the wounds to the wrists were only superficial. Defendant was employed from 1989 to the date of the crime. Defendant was competent to stand trial; he was able to help his attorneys, and he understood what his case was about.

The State then presented several witnesses in rebuttal. A former co-worker testified that defendant performed his job well and that he had no trouble conversing with defendant. A cellmate testified that defendant played chess, talked with other inmates, exercised and read; he acknowledged, however, that defendant "wasn't dealing with a full deck." A former supervisor testified that defendant was a diligent and efficient worker.

## Jury Selection Issues

### II.

### A.

Defendant first argues that the trial court erred in excusing for cause three jurors, each of whom expressed some doubt in his or her ability to recommend the death penalty. In a related argument, he contends the trial court should have permitted him to question each of these jurors further regarding his or her ability to impose the death penalty.

Defendant's strongest argument lies with respect to prospective juror Patricia Allred.[1] On voir dire by the prosecution the following transpired:

---

1. Defendant also makes reference to the voir dire of prospective jurors Gretna Bonkemeyer and Ronald Griffin. We find, however, that those jurors clearly expressed that they could not impose the death penalty. When asked if they would vote against the imposition of the death penalty without regard to the evidence, they both responded, "yes." Further, the entire exchange with them makes it clear that they were strongly opposed to the death penalty and that those beliefs would have substantially impaired their ability to apply the law. Defendant apparently recognizes the weakness of his argument as to Bonkemeyer and Griffin as he did not include any of their statements in his brief nor does he direct us to their location in the record.

STATE v. ROUSE

[339 N.C. 59 (1994)]

MR. YATES [District Attorney]: . . . The two possible punishments are life imprisonment and the death penalty. Because it is a possible punishment in the case I need to know your viewpoints on the death penalty, if you have ever thought about it. Basically, I need to know, do you have any moral or religious scruples against capital punishment?

MS. ALLRED: That's a tough question. I have thought about it a lot. I lean toward not believing in the death penalty. I don't know that I can say absolutely I don't. I'm not—But I lean toward not.

MR. YATES: At this point I guess it's one of those times in life when you're going to have to answer my question whether you want to or not. So, you would say you have some religious beliefs or scruples against capital punishment?

MS. ALLRED: Yes.

MR. YATES: On account of those scruples or beliefs, would it be impossible under any circumstances or any events for you to return a verdict of guilty as charged without a recommendation of life, imprisonment, [sic] even though the State proved the Defendant's guilt beyond a reasonable doubt? In other words, would you automatically vote against the death penalty?

MS. ALLRED: I think I would.

. . . .

MR. YATES: Would you automatically vote against capital punishment which is the death penalty, despite what the evidence of aggravating factors might be at trial?

MS. ALLRED: I'm not sure.

MR. YATES: Okay. I just sort of need a—I'm not sure—That kind of puts me in a worse position than if you answered yes or no.

MS. ALLRED: I'm just trying to be honest.

MR. YATES: That's fine. We—Some people believe in it and some people don't. At this point it is a possible punishment and only if a juror is willing to consider that punishment are they qualified to serve on the jury involving this.

MS. ALLRED: I don't believe I could vote for the death penalty.

**STATE v. ROUSE**

[339 N.C. 59 (1994)]

Mr. Yates: Are you saying that you would not be in favor of the death penalty under any facts or circumstances, no matter what the facts of the case are?

Ms. Allred: No, sir.

Mr. Yates: State will challenge for cause.

The Court: Ms. Allred, let me see if I understand your position. You have indicated to the District Attorney that you have substantial reservations about the death penalty. In the State of North Carolina in a first-degree murder case, as Mr. Yates has previously indicated, if in fact you arrive at the sentencing stage which depends on whether the Defendant is found guilty of first-degree murder or not, our present statutory scheme of things is that in a first-degree murder case it provides that a jury may consider aggravating circumstances and mitigating circumstances that will be offered by the parties in the jury's consideration as to which is the appropriate punishment in this case. As the Trial Judge I will be responsible for giving you certain guidelines to go by in evaluating the evidence. There are only two possible options for the jury to consider, and that will be the death penalty or life imprisonment. I need to determine at this stage whether or not your substantial reservations which you have indicated to Mr. Yates would prohibit or foreclose you considering the death penalty in this case?

Ms. Allred: I think it would.

At this time the trial court excused Allred for cause. Defense counsel then requested to be allowed to question the juror, which the trial judge denied.

[1] Defendant first argues that the trial court erred in granting the State's request to dismiss Allred for cause. Based on a defendant's right to an impartial jury, a juror may not be excused for cause simply because he "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, *reh'g denied*, 393 U.S. 898, 21 L. Ed. 2d 186 (1986). A juror may be excused for cause, however, when his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985).

STATE v. ROUSE

[339 N.C. 59 (1994)]

The difficulty of distinguishing between a juror who merely has misgivings against the death penalty and a juror who would be substantially impaired in performing his duties by those misgivings was recognized in *Witt*, in which the Supreme Court stated:

> [M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

*Witt*, 469 U.S. at 424-26, 83 L. Ed. 2d at 852. Based on the superior vantage point of the trial judge, his decision as to whether a juror's views would substantially impair the performance of his duties is to be afforded deference; and unless a decision one way or the other is required by law, it lies within the ambit of the trial court's discretion. *Id.*; *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 908 (1993); *State v. Cunningham*, 333 N.C. 744, 753, 429 S.E.2d 718, 723 (1993); *State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992).

Considering the exchange among the prosecutor, the trial judge, and prospective juror Allred we find the trial judge did not abuse his discretion in determining that Allred's views would prevent or substantially impair her from performing her duties as a juror. On voir dire she stated, "I don't believe I could vote for the death penalty," and "I think I would [automatically vote against the death penalty]." After the State challenged Allred for cause the judge asked Allred "whether or not your substantial reservations which you have indicated to Mr. Yates would prohibit or foreclose you considering the death penalty in this case." Allred responded, "I think it would."

This voir dire exchange is similar to the one at issue in *Brogden*. In *Brogden* the prospective juror at times indicated that he could vote for imposition of the death penalty where supported by the evidence. *Id.* at 48, 430 S.E.2d at 910-11. He also stated, however, that his feelings toward the death penalty would "partially" impair his performance as a juror and later stated, "To some extent I think I probably won't be [qualified]." *Id.* at 50-51, 430 S.E.2d at 911. We held on those facts the trial judge did not abuse his discretion in removing the juror for cause. *Id.*; *see also id.* at 51-52, 430 S.E.2d at 911-12 (citing cases

affirming trial court's excusal for cause). We therefore reject defendant's argument on this point.

Defendant next argues that Allred's responses were not unequivocal and clear and that he therefore should have been permitted to question Allred further, which would have resulted in Allred answering the dispositive questions differently. Where questioning by the defendant regarding the prospective juror's ability to impose the death penalty likely would have resulted in different responses to the dispositive questions, it is reversible error for the trial court to deny a request for such further questioning. *Brogden,* 334 N.C. at 52, 430 S.E.2d at 912. In the case at hand, however, the record does not indicate that Allred would likely have responded differently had defendant questioned her.

Allred's entire voir dire testimony reveals that she had "religious beliefs or scruples against capital punishment" which caused her to "lean toward not believing in the death penalty." When asked whether she "would . . . automatically vote against the death penalty" she responded, "I think I would." She later stated, "I don't believe I could vote for the death penalty." And finally, when asked whether her feelings toward the death penalty would "prohibit or foreclose" her from considering the death penalty she responded, "I think it would."

We stated in *State v. Oliver,* 302 N.C. 28, 40, 274 S.E.2d 183, 191 (1981), *appeal after remand,* 309 N.C. 326, 307 S.E.2d 304 (1983):

> When challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged [about the matter further].

We conclude, in light of Allred's strong responses, defendant has failed to show that further questioning would likely have resulted in different responses. We acknowledge that Allred on occasion vacillated in her responses, but the clear import of her entire testimony was that her reservations about the death penalty would substantially impair her ability to fulfill her duties as a juror. *Compare Brogden,* 334 N.C. at 52, 430 S.E.2d at 912-13 (where prospective juror's responses indicated confusion over prosecutor's questions, and where some of his responses clearly indicated that he could impose

the death penalty depending on the evidence, it was error to deny defendant's request to question juror further).

Defendant's contentions on this assignment are, therefore, without merit.

### B.

[2] Defendant next argues the trial court erred in overruling his objections to the State's use of a peremptory challenge on the ground that it was racially motivated.

Eighty-two jurors were excused during jury voir dire. The State and defendant each exercised sixteen peremptory challenges. All but three of the excused jurors were white. Two of these three were excused for cause at the State's request. The third, Sandra Mason, who is black, was peremptorily challenged by the State on the ground that she had reservations about imposing the death penalty.[2] The eventual composition of the jury was all white.

Defendant argues that the State's peremptory challenge of prospective juror Mason violated *Batson v. Kentucky*, 476 U.S. 90, 90 L. Ed. 2d 69 (1986), which holds that it is constitutional error to exclude a juror on the basis of race. Where "a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination," the issue is whether the reason given by the prosecutor was legitimate or merely pretextual. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991); *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991). "Unless a discriminatory intent is inherent in the prosecutor's explanation the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406. As this determination is essentially a question of fact, the trial court's decision of whether the prosecutor had a discriminatory intent will be upheld unless that finding is clearly erroneous. *Id.* at 369, 114 L. Ed. 2d at 412; *State v. Thomas*, 329 N.C. 423, 432, 407 S.E.2d 141, 148 (1991). In this case the prosecutor offered a race-neutral reason for his challenge; thus the issue is whether the trial court's determination that that reason was legitimate and not pretextual is clearly erroneous.

2. Defendant asserts in his brief that the State also challenged Mason on the basis of her having read about the murder in the newspaper. We believe, however, that although the State made one reference to Mason's having read about the case, a fair reading of the transcript indicates the State challenged Mason exclusively on the basis of her responses regarding the death penalty.

The transcript reveals the reason given by the prosecutor was supported by Mason's responses to his questions. The following exchange occurred on voir dire between the prosecutor and Mason:

Mr. Yates: First of all, do you have any strong moral or religious scruples or beliefs against capital punishment?

Ms. Mason: Not strong.

Mr. Yates: Not Strong? But you have some beliefs against it?

Ms. Mason: Yes.

In response to further questions Mason indicated that "depend[ing] on the evidence" death was a "possible punishment" and that she would not automatically vote against it. She also indicated that she "could go with the law." After further questioning regarding an article Mason had read on the case and other issues, the trial judge received a phone call. Upon his return, the prosecutor asked Mason:

Mr. Yates: . . . Did you say you had some problems with the death penalty?

Ms. Mason: You mean voting for it; yes, sir.

Mr. Yates: But you won't say you would rule it out in every case?

Ms. Mason: No.

Mr. Yates: There may be some cases out there in the sun that you would vote for it, but on most cases you would have a problem?

Ms. Mason: Yes.

Regardless of whether these responses are enough to justify a challenge for cause, they clearly show that Mason may have had some reservations about capital punishment which could have affected her decision whether to recommend a sentence of death. *See Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88 (prosecutor's reasons for peremptory challenge need not justify a challenge for cause). Even though some of Mason's answers indicated that she could vote for imposition of the death penalty depending on the evidence, the prosecutor, based on the entire voir dire with Mason, may have had a legitimate "hunch" that her reservations toward the death penalty would affect her decision making. *See Thomas*, 329 N.C. at 432, 407 S.E.2d at 147 (prosecutor may exercise peremptory challenges based on legitimate "hunches" and his past experience).

Despite the testimony in the record supporting the reason given by the prosecutor, defendant attempts to show that the prosecutor did not challenge Mason based on her views about the death penalty by referring to eleven prospective jurors, some of whom were eventually seated, who were not challenged by the prosecutor but expressed some reservation about the death penalty. First, we find that none of these jurors expressed to the same degree as Mason that their feelings about the death penalty would affect their decision whether to recommend that sentence: Ruby Priddy would not "object" to the death penalty if the evidence were there and she "felt real well about it"; Kathryn Byrd "could consider" the death penalty; Randall McGee thought the death penalty was a "just cause" but "only if the party's proven guilty without question about it"; Gladys Fox "believe[d] in the death penalty . . . on occasions." The other jurors expressed even less difficulty in recommending a sentence of death. Thus, defendant has not shown that the prosecutor failed to challenge any juror whose responses were similar to or stronger than those of Mason.

Even if the responses of these eleven jurors were similar to those of Mason, however, that would not in this case demonstrate that the reason given by the prosecutor for challenge was merely pretext. It bears emphasis that in addition to peremptorily excusing Mason the prosecutor also peremptorily challenged fifteen white jurors and challenged for cause several other white jurors.[3] Moreover, several of the white jurors peremptorily challenged by the prosecutor gave responses similar to those of Mason.[4] The Constitution does not require the prosecutor to exercise his peremptory challenges with precise consistency. Moreover, jury selection is "more art than science" and only "[r]arely will a single factor control the decision-making process." *State v. Porter*, 326 N.C. 489, 497, 391 S.E.2d 144, 150 (1990).

3. We emphasize that exercising some peremptory challenges in a manner which does not discriminate on the basis of race does not correct, or erase, a constitutional violation as to an individual juror. *See Batson*, 476 U.S. at 95, 90 L. Ed. 2d at 87. Those peremptory challenges which are clearly exercised in a non-discriminatory fashion, however, may be some evidence that other challenges were exercised in a non-discriminatory fashion.

4. Prospective juror Siebenhaar, for example, stated, "I believe that the death penalty is needed in some cases, but I'm not really a believer of it." Juror Lucas stated, "I have never really given it a whole lot of thought. I suppose, you know, I could, depending on the circumstances, you know, and how heinous the crime was and so on. I suppose I could do that." The prosecutor expressly stated that Siebenhaar was challenged for his views on the death penalty and while the prosecutor did not give his rea-

Based on the reasons given by the prosecutor, which are supported by the record and not inconsistent with his other peremptory challenges, and based on the entire jury selection process, we conclude the trial court's finding that the prosecutor's challenge of prospective juror Mason was not racially motivated is not clearly erroneous.

### Guilt Phase Issue

### III.

**[3]** Defendant argues the trial court erred in excluding a portion of police video tape depicting a box behind the door of the storage room where he and the body of Hazel Broadway were found. He contends the exclusion of this evidence prejudiced his case since it would have tended to rebut the State's evidence that he was found hiding behind the door. Defendant asserts the evidence showing that he was hiding when found was harmful because it indicated an acknowledgment of wrongdoing which negatively affected his defense that he was mentally impaired at the time of the killing.

The record, however, reveals that defendant failed to object to the exclusion of this portion of the videotape and in fact objected to the portion of the videotape showing the storage room. During the *in camera* hearing to determine the admissibility of the videotape, defense counsel objected to the portion of the videotape which began at the storage room, stating, "Your Honor, we object here again for the redundancy and prejudicial and inflaming. The pool of blood there is much larger than it was in the photograph. Obviously, she's still bleeding." During that same portion of the tape, which continued to show the storage room, defense counsel again stated, "Same objection, Your Honor." The transcript reveals no request by defendant to show the portion of the tape depicting the box and no objection to the exclusion of that portion. While it is arguable that any error in the exclusion of the evidence of which defendant now complains was invited error, *see* N.C.G.S. § 15A-1443(c), it is clear that defendant failed properly to object to its exclusion, and thus he must show plain error. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). Since defendant has not shown that the exclusion of this evidence likely affected the outcome of his trial, his assignment is overruled.

---

sons for peremptorily challenging juror Lucas and others, their responses regarding the death penalty, in addition to their other responses, leads to the inference that the prosecutor challenged them based on their tentative responses regarding capital punishment. This is some indication that the prosecutor challenged Mason based on her responses to his questions about the death penalty and not based on Mason's race.

STATE v. ROUSE

[339 N.C. 59 (1994)]

Sentencing Phase Issues

At the sentencing phase the State introduced no evidence. The defendant entered the following evidence:

Dr. Robert Lee Conder, Jr., a clinical neuropsychologist, diagnosed defendant as suffering from organic personalities syndrome, which is characterized by variations in behavioral functioning as a result of a brain malfunction. He also diagnosed defendant with recurrent major depression. His final diagnoses were organic personality disorder or major depression, substance abuse disorder, and mixed personality disorder. On 16 March 1991 defendant had a long-standing mental disease, and he did not understand the nature of his behavior.

Dr. Condor's diagnoses were based on tests and interviews with defendant. He also used defendant's school, hospital and mental health records. Those records reflected that defendant's academic performance was at the lower end of the average to low average, and his verbal intelligence was in the borderline intellectual function. In Asheboro defendant had been found to be learning disabled. Tests revealed defendant's IQ to be 80. In 1985 defendant sustained a head injury. In 1986 he was admitted to the hospital due to an overdose of pills. In 1986 defendant also cut his wrists. At that time he was diagnosed as having recurrent major depression.

On cross-examination it was revealed that defendant stated he used marijuana because it made him feel good. Defendant had been released from out-patient treatment in 1988 because it was felt that his psychological condition had improved. Defendant told Dr. Conder that he used alcohol and cocaine on the evening of 16 March 1991.

Dr. Rollins, who also testified in the guilt phase, testified that on 16 March 1991 defendant had the mental disorders of organic personality disorder, which affects brain function and impairs judgment; mixed substance abuse based on his chronic use of cocaine, marijuana and alcohol; mixed personality disorder reflected by his unstable lifestyle; and borderline intellectual functioning reflected by his low IQ, which is between 70 and 80. On 16 March 1991, defendant's ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was impaired.

On cross-examination Dr. Rollins testified that defendant's suicide incidents were gestures. In school in Asheboro defendant was

performing within normal range in some areas. Between 1989 and 16 March 1991, defendant was working regularly at a job.

Croft Waylon Mangum, director of the Randolph Fellowship Home, Inc., testified that while defendant lived at the House, Mangum observed inconsistent behavioral patterns. Sometimes defendant would follow directions and sometimes he would not; sometimes he would interact with others and sometimes he would not. Defendant preferred to shoot pool and play his guitar rather than do his chores.

Annie Utley Rouse, defendant's mother, testified about defendant's life, focusing on his childhood. Defendant was born in Augusta, Georgia. He was quiet. Defendant's father was abusive toward Annie Rouse. They moved to North Carolina and defendant's parents divorced. Defendant dropped out of school and took a job washing dishes. Defendant's father later shot his mother, for which defendant blamed himself. Defendant once took an overdose of pills and once cut his wrists. Defendant started using marijuana. Defendant got a job and a place to live, but he often lost his wallet and keys. Defendant's friends were younger and used drugs and alcohol. On cross-examination Annie Rouse testified that defendant was never physically abused by his father. In 1988 defendant was doing well and did not need further out-patient treatment. Defendant began a course at a community college and wanted to get his GED.

The court submitted to the jury the following aggravating circumstances:

(1)  Was this murder committed by the defendant while the defendant was engaged in the commission of or attempting to commit Robbery With A Dangerous Weapon and attempting to commit First Degree Rape?

ANSWER: _____

(2)  Was this murder especially heinous, atrocious or cruel.

ANSWER: _____

The jury answered both questions affirmatively. One or more jurors found the following mitigating circumstances: "This murder was committed while the defendant was under the influence of a mental or emotional disturbance"; "That the Defendant has suffered from a history of depression"; "That upon his arrest, the Defendant cooperated with law enforcement officers to the extent of physically responding to the directives of law enforcement officers"; "That the Defendant was identified

as 'different' by his classmates and co-workers and was often the object of much teasing and joking"; "Any other circumstance or circumstances arising from the evidence which one or more of you deems to have mitigating value." The jury unanimously rejected the following mitigating circumstances: "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired"; "The age of the defendant at the time of this murder is a mitigating circumstance"; "That the Defendant suffers from a learning disability"; "That the Defendant has a borderline intellectual function"; "That the Defendant suffers from substance abuse"; "That the Defendant suffered head injuries from various accidents"; "That the Defendant was gainfully employed at the time of the commission of the crimes and has been so employed in the past"; "That the Defendant, as a child, observed verbal and physical abuse of his mother by his father"; "That the Defendant is a child of an alcoholic parent, Willie Herbert Rouse"; "That the Defendant, in the past, has sought help for his psychiatric and substance abuse problems"; "That the Defendant has love for his family"; "That the Defendant was upset when his parents separated."

The jury unanimously found beyond a reasonable doubt that the mitigating circumstances found by one or more jurors were insufficient to outweigh the aggravating circumstances found. It further unanimously found that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstances found by one or more jurors.

## IV.

[4] Defendant argues the trial court erred in sustaining an objection to the testimony of Dr. Bob Rollins relating to defendant's ability to adjust to prison life.

Q. MR. WILLIAMS [Defense Counsel]: Dr. Rollins, based upon your review of Mr. Rouse's medical, psychiatric, educational, and employment records and upon your own evaluation, do you have an opinion as to how Mr. Rouse would adjust to the discipline and regulations of prison life?

A. [Mr. Rollins]: Just fine.

THE COURT: That's been excluded by the Supreme Court. Sustained.

Q. MR. WILLIAMS: Dr. Rollins, based upon your review of the records and your evaluations, do you have an opinion regarding how Mr. Rouse would adjust or need a structured environment of some sort?

MR. YATES: Objection.

THE COURT: Overruled.

A. [Rollins]: Based on what we know of Mr. Rouse's history, just in the past few months, he makes his best adjustments in structured and supervised situations.

We conclude the trial court's ruling excluding Dr. Rollins opinion as to defendant's ability to adjust to prison life was error but the State has shown beyond a reasonable doubt that the error was harmless. N.C.G.S. § 15A-1443(b) (1988).

Evidence of ability to "adjust well to prison life" is proper evidence in mitigation. *State v. Ali*, 329 N.C. 394, 421, 407 S.E.2d 183, 199 (1991). Since the trial court cannot restrict the jury's consideration of "any relevant mitigating evidence," it is required to admit evidence of "defendant's disposition to make a well-behaved and peaceful adjustment to prison life." *Skipper v. South Carolina*, 476 U.S. 1, 4, 7, 90 L. Ed. 2d 1, 6, 8 (1986).

The State does not contest this principle, but instead takes issue with the way in which defendant sought to prove his ability to adjust to prison life. It contends the defendant could have introduced evidence of his past conduct to establish his ability to adjust to prison life, but that he could not offer Dr. Rollins' expert testimony to make that same point since his opinion "was based upon no foundation on the basis of which he was more qualified than the jury to make such a conclusion." The State cites dicta in a footnote in *State v. Pinch* where we said that the psychiatrist's opinion that the defendant would be able to adjust to prison life was properly excluded "because there was an insufficient foundation in the record for a conclusion that he was better qualified to have an opinion on this subject than the jury." 306 N.C. 1, 21-22 n.10, 292 S.E.2d 203, 220 n.10, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994). We question the continued validity of that dicta; and insofar as it is inconsistent with our holding here, it is disapproved. The record in this case indicates that Dr. Rollins was

highly trained and experienced in the field of forensic psychiatry and the trial court accepted Dr. Rollins as an expert in forensic psychiatry. Further, Dr. Rollins interviewed defendant twice, spoke with his family members, reviewed defendant's hospital, mental health, and employment records, and reviewed Dr. Conder's report of defendant's performance on various tests. We believe that Dr. Rollins, a qualified forensic psychiatrist, having conducted an intense investigation into defendant's mental health, could have given expert testimony that would have assisted the jury in determining whether defendant would adjust well to prison life. Thus, it was error to exclude his response to defense counsel's question.

We nevertheless conclude the error in sustaining the State's objection was harmless beyond a reasonable doubt. Immediately thereafter defendant asked Dr. Rollins whether "based on [his] review of the records and . . . evaluations," he "ha[d] an opinion regarding how Mr. Rouse would adjust or need a structured environment of some sort?" An objection to this question by the prosecutor was overruled and Dr. Rollins responded, "Based on what we know of Mr. Rouse's history, he makes his best adjustments in structured and supervised situations." Moreover, the following occurred on direct examination of defendant's other mental health expert, Dr. Robert L. Conder:

Q.  Based on your review of Mr. Rouse's medical, educational and psychiatric records and upon your testing, do you have an opinion of how he would be able to adjust to discipline and regulation of prison life?

A.  Yes, I do.

Q.  What is that opinion?

A.   I think he adjusts well . . . and with external structure he seems to do pretty well.

Because of the testimony of Dr. Rollins and Dr. Conder, which was admitted, we are satisfied the error complained of was harmless beyond a reasonable doubt.

V.

[5]  Defendant next argues the trial court erred in denying his request for a psychiatric examination and a competency hearing.

During the sentencing phase of the trial defendant's mother, Annie Rouse, testified about how defendant considered himself a failure. After her testimony the trial court called a fifteen minute recess. During the recess defendant, while handcuffed, broke the glass on the door to his cell, placed his hands through the opening, and cut his wrists on the glass. The court was made aware of the incident, delayed the proceedings, and instructed the bailiff to have a report prepared and have someone available to testify after lunch about defendant's physical condition. The trial court then stated during the recess that defendant:

> placed one or both of his hands or arms through one of the windows located in that holding area and suffered some injury to one or both of his wrist area. For that purpose it is appropriate at this time out of the presence of the jury to make an inquiry in respect to the circumstances dealing with that, and receive any medical information that is appropriate concerning the present situation, medical situation of the Defendant.

The court then, on its own motion, called the bailiff and a nurse from the sheriff's department to testify "concerning the circumstances of the present medical condition of the Defendant." The bailiff essentially testified that when he entered defendant's holding cell he found defendant's wrists bleeding. The nurse testified that she treated defendant near the cell and observed that he had cut one of the arteries on his wrist. She summarized the report made at the hospital to which defendant was taken and described defendant's injury and the treatment given. She was then asked whether she had an opinion "as to whether or not he [defendant] is presently able to continue with the trial of the matter based upon your observations and your nursing experience." She responded, "Yes, sir."

The court then said, "The Court is satisfied with this showing, but I will give either side an opportunity to call additional witnesses if you choose to do so." Defense counsel stated:

> Your Honor's showing at this particular point pertains to the testimony of the nurse as far as his medical condition or pertaining to the physical injuries that he received as a result of placing his wrists through the window. I feel compelled at this point to request the Court to have Mr. Rouse examined from psychological viewpoint [sic] in light of the history of previous suicide attempts as has been testified during the sentencing phase at this proceeding to determine whether or not Mr. Rouse is still of com-

petent mind to continue through the proceeding as it is now unfolding because of the nature of these proceedings are a critical stage of the proceedings for Defendant. I have not had an opportunity at this particular point to talk with Mr. Rouse or confer with Mr. Rouse. When I went to the jail he had not returned at about quarter till and when I came back up to the courtroom he was not here, and I arrived just shortly before court convened.

The trial court then conversed with defense counsel regarding whether Mrs. Rouse was the defendant's last witness, after which the trial court entered findings regarding defendant's medical condition, findings regarding the incident in the holding cell, and concluded that "as a result of Linda Parrish, Registered Nurse's observations of the Defendant, both before and after the injuries to the Defendant, the Court finds that the Defendant is competent to proceed with the trial and orders the trial to proceed at least at this stage."

We conclude the trial court acted within its discretion in denying defendant's request for a psychological examination. N.C.G.S. § 15A-1002(b)(1) provides that when "the capacity of the defendant to proceed is questioned, the trial court [m]ay appoint one or more impartial medical experts to examine the defendant." Whether the trial court appoints such an expert is within its discretion. *State v. See*, 301 N.C. 388, 394, 271 S.E.2d 282, 285 (1980). In this case, defendant's own expert witness had previously testified that he was competent to stand trial. The only additional evidence before the court at the time it denied the request for a psychological examination was a suicide attempt, or suicide gesture. That one incident, however, did not require as a matter of law that the trial court appoint an expert to evaluate defendant's mental health.

We also conclude the trial court did not violate N.C.G.S. § 15A-1002, which provides:

When the capacity of the defendant to proceed is questioned, the court . . . [m]ust hold a hearing to determine the defendant's capacity to proceed. If [a mental health] examination is ordered . . ., the hearing must be held after the examination. Reasonable notice must be given to the defendant and to the prosecutor and the State and the defendant may introduce evidence.

Initially, we note that we are skeptical that the defendant's capacity was questioned in a manner which required a hearing. Defendant never requested a hearing to determine capacity, but merely request-

ed that the trial court have defendant examined. One of defendant's mental health experts had previously testified that defendant was competent, and there were no new circumstances before the court genuinely calling into question defendant's capacity to proceed.

Even if a hearing were required, the trial court substantially complied with the statute. Prior to ruling that defendant was competent to proceed, the trial court called two witnesses to testify to their knowledge of defendant's actions in the holding cell and his physical condition. At this time the court had heard considerable testimony by Dr. Rollins and Dr. Condor relating to defendant's mental condition. Dr. Rollins had testified that defendant was competent to stand trial, that he was able to help his attorneys, and that he was aware of what the case was about. Dr. Rollins also testified that defendant had in the past engaged in suicide gestures aimed at diverting attention or eliciting sympathy. The trial court asked whether defendant wanted to introduce evidence, but defendant declined. Based on the trial court's prompt, diligent and thorough action, we conclude that it satisfactorily complied with the requirements of N.C.G.S. § 15A-1002. *See State v. Gates,* 65 N.C. App. 277, 283, 309 S.E.2d 498, 502 (1983) (court complied with 15A-1002 when it conducted a hearing at which defendant was permitted to present evidence bearing on competence; manner of conducting hearing within court's discretion).

VI.

[6] Defendant next argues the trial court erred in refusing to submit mitigating circumstances which he tendered to the court on 14 March 1992, during the sentencing phase of the trial. Specifically, the trial court did not submit: Defendant would adjust well to prison life; defendant had been non-violent since his arrest; defendant experienced academic failures; defendant blamed himself for his father shooting his mother; and defendant had been gainfully employed. Instead of the proposed instruction that defendant "has affection and respect for his mother," the trial court submitted the circumstance that defendant "has love for his family." Instead of separate instructions for defendant's past employment and for his employment at the time of the crimes, the court submitted that defendant "was gainfully employed at the time of the commission of the crimes and has been so employed in the past."

The record reveals, however, that defendant has waived any error with respect to the mitigating circumstances submitted. At the charge conference 24 March 1992, the trial judge stated that he would submit

STATE v. ROUSE

[339 N.C. 59 (1994)]

three statutory mitigating circumstances and thirteen non-statutory mitigating circumstances. He then provided counsel for the State and for defendant with a copy of all circumstances to be submitted, at which time he said:

> THE COURT: . . . Mr. Williams [defense counsel], I'll let you and Mr. Oldham [defense counsel] confer if you wish to do so about the list which has been furnished to you and whether or not there are any other appropriate mitigating circumstances.

> MR. WILLIAMS: Your Honor, that looks satisfactory to us.

Administrative matters were then addressed after which the following transpired:

> THE COURT: . . . Based upon [the foregoing], are there any additional requests from the State?

> MR. YATES: No, sir; Your Honor.

> THE COURT: Mr. Williams, Mr. Oldham?

> MR. WILLIAMS: Could we have just a moment, Your Honor?

> THE COURT: Yes, we'll be at ease a moment.

> MR. WILLIAMS: Did I understand that you're still going to follow the Pattern Jury Instruction 150.10?

> THE COURT: Yes, sir.

> MR. WILLIAMS: And these will be inserted in the appropriate places?

> THE COURT: That's correct. Right. That's correct.

> MR. WILLIAMS: Your Honor, this looks satisfactory to the defense.

>     . . . .

> THE COURT: . . . With that, are there any other matters from either side, other than just letting the attorneys review the finished Issues and Recommendations?

> MR. OLDHAM: I'm not aware of any, Your Honor.

By expressing approval to the trial court of the nonstatutory mitigating circumstances submitted and failing to express any objection to those mitigating circumstances upon invitation by the trial court, any error in failing to submit nonstatutory mitigating circumstances

was error "resulting from [defendant's] own conduct" and he may not assert that he was prejudiced thereby. N.C.G.S. § 15A-1443(c) (1988). This assignment of error is, therefore, overruled.

VII.

Defendant next argues the trial court erred in failing to intervene *ex mero motu* during the prosecutor's closing arguments. Since defendant made no objection during closing arguments, he must demonstrate that the prosecutor's closing arguments amounted to gross impropriety. *See State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979). In making this inquiry it must be stressed that prosecutors are given wide latitude in their argument, *State v. Syriani*, 333 N.C. 350, 398, 428 S.E.2d 118, 144, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994), and that:

> [p]rosecutorial statements are not placed in an isolated vacuum on appeal. Fair consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they referred. Moreover, it must be remembered that the prosecutor of a capital case has a duty to pursue ardently the goal of persuading the jury that the facts in evidence warrant imposition of the death penalty.

*State v. Pinch*, 306 N.C. at 24, 292 S.E.2d at 221-22.

[7] Defendant refers to numerous statements made by the prosecutor during closing arguments. He first refers to the following set of statements made by the prosecutor: "Sitting over there is probably one of the most brutal, vicious murderers in the history of Randolph County and Asheboro"; "Is there ever a murder enough to call for the death penalty if this isn't one?"; "He's one of the more brutal murderers ever in Randolph County"; "You're going to have to come out and look at Ms. Broadway's family. They've put faith in you; I've put faith in you, and [Detective] Ricky Wilson has put the faith in you. We've decided on you as jurors. We believe you'll do the right thing."

Defendant contends that in making these statements the prosecutor improperly expressed his opinion that defendant should receive the death penalty, *see* N.C.G.S. § 15A-1230(a), improperly argued matters outside the record, *see id.*, and improperly suggested that the jury is an instrument of the State, *see State v. Brown*, 320 N.C. 179, 203, 358 S.E.2d 1, 18, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

Considering the brutality of the crime and that the State was seeking a recommendation of death, we conclude the prosecutor's statements were not grossly improper. The jury would have understood the prosecutor's remarks to address the severity of the crime before them. *See State v. Johnson*, 298 N.C. at 368, 259 S.E.2d at 761 (Prosecutor said crime was "just about as bad as anything I've ever heard all my life" and that "I think this case, and the facts that you have in front of you now, absolutely and without question call for the imposition of the death penalty"; held, statements were not grossly improper.). Considering the thorough instructions given by the trial court regarding the jury's role in determining whether defendant should be put to death, it would not have understood its function to be merely an extension of the State.

[8] Defendant next points to statements by the prosecutor relating to defendant's dangerous character. The prosecutor said, "It's too late to save Ms. Broadway today. But it's not too late in saving some officers from seeing any other person in this condition that they had to view Ms. Broadway in." He also stated that the crime was not a "one-shot deal" or a "one-shot robbery . . . [t]his is rape" and that the defendant was a "maniac," a "mean, cold-blooded killer," a "violent murderer," and a vicious murderer who "lust[ed] for blood like a jackal eating a rabbit." Defendant argues that these statements were improper because there was no evidence that he had committed any other crime of violence.

It is not improper for the prosecutor to urge the jury to recommend the death penalty in order to deter the defendant from killing again, and thus the prosecutor's statements in that vein were permissible. *State v. Zuniga*, 320 N.C. 233, 357 S.E.2d 898, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). The statements describing the defendant were not grossly improper as they were a fair characterization of defendant based on the brutality of the crime and they were aimed at the penalty sought by the State. As for the comparison of the defendant to a jackal, the trial court instructed the jury to disregard that statement, and jurors are presumed to follow the instructions given. *State v. Jennings*, 333 N.C. 579, 618, 430 S.E.2d 188, 208, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 602 (1993). As for the statements that the robbery was accompanied by a rape, that was consistent with the evidence. *See State v. Syriani*, 333 N.C. 350, 398, 428 S.E.2d 118, 144 (1979).

**[9]** Defendant next refers to statements by the prosecutor that the jury should not base its decision on mercy or sympathy. He stated, for example, "[your decision is] not based on a sympathy or mercy verdict. It's based on the law" and "[y]ou weigh [aggravating and mitigating] factors and you make a decision based on the law, not on mercy, sympathy, and whatever." While the trial court may not preclude the jury from considering "compassionate or mitigating factors stemming from the diverse frailties of humankind," *Woodson v. North Carolina,* 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961 (1976), the prosecutor may discourage the jury from having mere sympathy not related to the evidence in the case affect its decision, *State v. Quesinberry,* 325 N.C. 125, 141-42, 381 S.E.2d 681, 691 (1989), *sentence vacated,* 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *in light of McKoy v. North Carolina,* 494 U.S. 433, 108 L. Ed. 2d 369 (1990) (no reversible error in prosecutor telling jury that defendant should receive no mercy). Such statements are consistent with the prosecutor's role in seeking a recommendation of death. *See Pinch,* 306 N.C. at 24, 292 S.E.2d at 221-22 (prosecutor in a capital case "has a duty to pursue ardently the goal of persuading the jury that the facts in evidence warrant imposition of the ultimate penalty").

**[10]** Defendant next complains of statements by the prosecutor relating to certain mitigating circumstances. Defendant points to the prosecutor's statements "Does [this mitigating circumstance] lessen homicide?," "Why does that [mitigating circumstance] lessen this?," and "That's another mitigating factor? Does that lessen?" and asserts that these statements caused the jury mistakenly to believe that mitigating circumstances reduced the conviction to second-degree murder. We find, however, that the prosecutor's statements communicated to the jury only that the mitigating circumstance did not exist or that the jury should not give that circumstance any mitigating value.

In a related argument, defendant contends the prosecutor confused the jury by stating the mitigating circumstance that "defendant was under the influence of a mental or emotional disturbance" was the same as the circumstance that defendant's capacity "to appreciate the criminality of his conduct [or] to conform his conduct to the requirements of the law was impaired." We conclude the prosecutor's statements would not have caused the jury to be so confused. This conclusion is confirmed by the jury's finding one circumstance and rejecting the other. Defendant also asserts that the prosecutor's statement, "You are going to have to make a decision as to whether you feel [a mental disturbance of the defendant] is a mitigating circum-

stance" would have led the jury to believe that it did not have to give that circumstance any weight. We conclude the prosecutor's statement would have been construed in context as meaning that the jury had to determine whether that circumstance existed. In any event, the prosecutor's statements were not so grossly improper as to warrant a new sentencing proceeding.

[11] Finally, defendant contends that the prosecutor improperly made reference to the Bible. The prosecutor stated:

> The law is clear. This is a terrible, brutal, horrible, especially heinous and atrocious murder, and the law said those are the ones that get the death penalty. And Mr. Oldham [the defense attorney], as I said, may quote the scriptures. The Bible says don't take somebody's life. Well the Bible also says an eye for a eye and a tooth for a tooth. The law is clear. You weigh everything. You do your job.

This Court has disapproved Biblical references where "the arguments were to the effect that the law enforcement powers of the State came from God, and to resist those powers was to resist God." *State v. Laws*, 325 N.C. 81, 381 S.E.2d 609 (1989) (citing *State v. Moose*, 310 N.C. 482, 313 S.E.2d 507 (1984)), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *in light of McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). In *Laws* we did not find gross impropriety in the prosecutor's numerous references to the Bible where overall "the prosecutor pointed out that the jury's task was to do what was right by man's law." *Id.* at 120-21, 381 S.E.2d at 633. *See also State v. Brown*, 320 N.C. 179, 206, 358 S.E.2d 1, 19, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987) (no gross impropriety in prosecutor's statement that victim was denied opportunity to "get right with the Lord"). In this case, the Biblical reference by the prosecutor was similar to that in *Laws* in that he emphasized that it was the jury's role to apply the law as the court instructed. His statements were to the effect that the Bible contained arguably conflicting provisions regarding capital punishment and that it was the jury's role to determine defendant's fate depending solely on the law. We find no gross impropriety in the prosecutor's brief Biblical reference.

## VIII.

[12] Defendant next argues the prosecutor improperly commented on defendant's silence and the trial court erred in failing to intervene *ex mero motu*.

STATE v. ROUSE

[339 N.C. 59 (1994)]

The trial court submitted the mitigating circumstance "That upon his arrest, the Defendant cooperated with law enforcement officers to the extent of physically responding to the directives of law enforcement officers." The prosecutor, in closing, argued that "hold[ing] up his hands and show[ing] the blood that's all over him" was not a matter which should reduce defendant's culpability. He continued:

And he is so helpful he falls asleep. He's just brutally, viciously killed an innocent person and he is so remorseful he falls asleep. I know it's 6:00 in the morning, but he shows no remorse, no conscience. Just cool, cold, calculated. The blood is still on his hands. All over him. And there he is, he puts his head down and goes to sleep.

Defendant argues that these comments called attention to his exercise of his right to remain silent after arrest.

A defendant's silence after receiving Miranda warnings cannot be used against him as evidence of guilt. *Doyle v. Ohio*, 426 U.S. 610, 611, 49 L. Ed. 2d 91, 94 (1976). The record in this case does not indicate whether defendant received Miranda warnings; but if he did, there was no violation of his right to silence after Miranda warnings since the comments by the prosecutor did not address defendant's silence. Those comments were clearly directed toward showing the jury a broader picture of what defendant did after his arrest in order to convince the jury that it should afford no mitigating value to the submitted circumstance that "the Defendant cooperated with law enforcement officers to the extent of physically responding to the directives of law enforcement officers."

[13] Defendant next contends the prosecutor violated his right to remain silent at trial. The prosecutor argued to the jury that defendant had a pattern of denying and avoiding responsibility. He stated:

Another avoiding responsibility. Get sympathy. Get out of your troubles. We're here today, the same situation. Only this time he's not doing it, he's got everybody else to do it for him. Let's avoid the responsibility. Let avoid [sic] what took place on March 16th.

The prosecutor may not argue that the accused's silence at trial is evidence of guilt. *Griffin v. California*, 380 U.S. 609, 614-15, 14 L. Ed. 2d 106, 110, *reh'g denied*, 381 U.S. 957, 14 L. Ed. 2d 730 (1965). A prosecutor violates [this rule] if "the language used [was] manifestly intended to be, or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the

accused to testify." *United States v. Anderson*, 481 F.2d 685, 701 (4th Cir. 1973), *aff'd*, 417 U.S. 211, 41 L. Ed. 2d 20 (1974).

Applying this test to the prosecutor's comments, we conclude there was no gross impropriety. The overall gist of the prosecutor's comments was that defendant was trying to avoid responsibility for his actions by means of his psychiatric experts. To the extent that the prosecutor's statement could have been interpreted as a comment on defendant's silence, it was not an "extended reference." In *State v. Randolph*, 312 N.C. 198, 205, 321 S.E.2d 864, 869 (1984), the prosecutor,' referring to the defendants' flight after the crime, stated, "[the defendants] have not said much more about these affairs, but that was enough. They have spoken elegantly through their flight . . . from the scene." We found no error in the prosecutor's statement as there was no "extended reference" to defendants' silence. *Id.* at 206, 321 S.E.2d at 869. *See also State v. Allen*, 323 N.C. 208, 226, 372 S.E.2d 855, 866 (1988), *sentence vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *in light of McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990) (prosecutor's statement that "[defendant] will hide behind the Constitution of the country that protects us all" not gross impropriety requiring intervention *ex mero motu*).

With regard to this assignment of error, defendant relies heavily on *Lesko v. Lehman*, 925 F.2d 1527, 1540 (3rd Cir.), *cert. denied*, —— U.S. ——, 116 L. Ed. 2d 226 (1991), in which the court held the following language by the prosecutor to violate *Griffin*: "He didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say I'm sorry." The language of *Lesko*, however, was clearly language which would have been interpreted as reflecting defendant's silence. *See also State v. McLamb*, 235 N.C. 251, 257, 69 S.E.2d 537, 541 (1952) (prosecutor's comment that defendant was "hiding behind his wife's coat tail" was improper as it commented on defendant's failure to testify).

These assignments of error are, therefore, rejected.

## IX.

[14] Defendant next argues the trial court erred in submitting two aggravating circumstances which defendant contends are duplicative and the trial court erred in not instructing the jury *ex mero motu* that it should not consider the same evidence for both aggravating circumstances.

## STATE v. ROUSE

[339 N.C. 59 (1994)]

Defendant was convicted of first-degree murder based on premeditation and deliberation and on the felony-murder rule. The trial court submitted the following aggravating circumstances:

(1) Was this murder committed by the defendant while the defendant was engaged in the commission of or attempting to commit Robbery With A Dangerous Weapon and attempting to commit First Degree Rape?

ANSWER: _____

(2) Was this murder especially heinous, atrocious or cruel?

ANSWER: _____

The first circumstance referred to N.C.G.S. § 15A-2000(e)(5), relating to prior felonies.[5] The jury answered both of these questions "Yes."

It is error to submit two aggravating circumstances resting on the same evidence. *State v. Quesinberry*, 319 N.C. at 239, 354 S.E.2d at 453. Where, however, there is separate evidence supporting each aggravating circumstance, the trial court may submit both "even though the evidence supporting each may overlap." *State v. Gay*, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993).

A murder is "heinous, atrocious, or cruel" when it is a "conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Goodman*, 298 N.C. 1, 25, 257 S.E.2d 569, 585 (1979). It can be found where "the level of brutality involved exceeds that normally present in first-degree murder." *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds, State v. Vandiver*, 321 N.C. 570, 574, 364 S.E.2d 373, 375-76 (1988). A person is guilty of attempted first-degree rape if he attempts to engage in vaginal intercourse with another person by force and against the will of that person and employs or displays a dangerous or deadly weapon. N.C.G.S. § 14-27.2 (1993). "An attempted armed robbery with a dangerous weapon occurs when a person, with the specific intent to unlawfully deprive another of personal property by endangering or threatening his life with a dangerous weapon, does some overt act calculated to bring about this result." *State v. Allison*, 319 N.C. 92, 96, 352 S.E.2d 420, 423 (1987); *see* N.C.G.S. § 14-87.

---

5. We note that the first circumstance submitted by the trial court referred conjunctively to two felonies. While the normal practice would be to refer to alternative felonies disjunctively, the circumstance as submitted is not improper; and we conduct our analysis as though the jury found the existence of both felonies.

We find the trial court did not err in submitting the aggravating circumstances enumerated above. Evidence establishing the circumstance that the crime was especially heinous, atrocious or cruel concerned the brutality of the murder: The defendant stabbed Hazel Broadway at least seventeen times. After the final stab the butcher knife remained in Broadway's neck up to the handle. She had numerous bruises and several veins and arteries were severed. She suffered for fifteen minutes in this condition. Hazel Broadway was found lying in a pool of her blood. She lost one-half of her blood before dying. This is clearly enough evidence to establish that the murder was especially heinous, atrocious or cruel. *See State v. Brown*, 315 N.C. 40, 66-67, 337 S.E.2d 808, 827 (1985), *cert. denied*, 476 U.S. 1185, 90 L. Ed. 2d 733 (1986) (circumstance supported where victim shot six times and suffered intense pain for up to fifteen minutes before dying).

None of this evidence, however, was necessary to establish the felonies used for the aggravating circumstance that the murder was committed during the course of a felony and there was substantial other evidence supporting that circumstance. Evidence supporting the felony of attempted rape was that: Defendant was found behind the door to the storage room with his pants unzipped and his belt hanging off; pubic hairs of Broadway were found on defendant; and pubic hairs of defendant were found on Broadway. Moreover, as rape requires only force and not that the actor actually inflict physical injuries upon the victim to effect the penetration, the mere presence of the knife without considering any physical wounds leads to an inference that defendant used the force required for rape.

Evidence supporting the felony of attempted armed robbery was that defendant was found with at least one roll of coins consistent with the type used by The Pantry and, as with the felony of attempted rape, the presence of the knife which leads to an inference that defendant intended to use force. The fact that defendant actually used the knife to inflict physical injuries was not required to prove attempted armed robbery; defendant's act of going to The Pantry armed with a knife was enough alone to support the element of intent to use force.

The facts of this case are similar to those in *State v. Jennings*, 333 N.C. 579, 430 S.E.2d 188 (1993). In *Jennings* the defendant argued the trial court erred in submitting the aggravating factors that the murder was committed during a felony, namely the sex offense of "attempting the penetration of the anus with an object," and that the

murder was especially heinous, atrocious or cruel. In rejecting this argument, we reasoned that there was "substantial evidence of the especially heinous, atrocious, or cruel nature of the killing apart from the evidence as to whether the murder was committed" during a felonious sex offense. *Id.* at 627, 430 S.E.2d at 213. That other evidence in *Jennings* consisted of the savage beating of the victim, who sustained bruises, cuts and bleeding, and who died slowly after suffering considerable pain. *Id.* at 627, 430 S.E.2d at 213. Defendant's assignment of error on this point is, therefore, rejected.

**[15]** Defendant also contends that the trial court erred in not instructing the jury that it could not consider the same evidence in support of both aggravating circumstances. Defendant, however, did not request such an instruction and our review is therefore limited to review for plain error, which requires defendant to show that the error was so fundamental that another result would probably have obtained absent the error. *See State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, —— (1983). In light of the severity of the murder, including the multiple stab wounds and the victim's suffering which is almost certain, and the fact that there was independent evidence supporting each aggravating circumstance, defendant has not shown that any error likely affected the outcome. This assignment is therefore without merit.

## X.

**[16]** Defendant next argues the trial court erred in not submitting the mitigating circumstance that "defendant has no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1) (1988).

Defendant points to the following evidence adduced at trial: Defendant's mother testified that defendant sustained a head injury in an automobile accident. On cross-examination it was revealed that defendant was drinking at the time of the accident and that his blood alcohol level was .19 percent. It was also revealed that defendant's mother drove him to work because he "lost his driver's license" and defendant did not take steps to regain his license because he did not want it. Defendant's mother also testified about an attempted suicide. On cross-examination the prosecutor brought out that after the incident defendant resisted arrest, becoming "very combative" with the arresting officer. The jury also heard evidence indicating that defendant used illegal drugs over a number of years.

Defendant contends that based on this evidence the trial court should have submitted the mitigating circumstance of "no significant history of prior criminal activity." We disagree.

STATE v. ROUSE

[339 N.C. 59 (1994)]

The defendant bears the burden of producing "substantial evidence" tending to show the existence of a mitigating circumstance before that circumstance will be submitted to the jury. *State v. Laws*, 325 N.C. 81, 112, 381 S.E.2d 609, 627 (1989), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 503 (1990), *in light of McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). In *Laws* a witness for the defendant testified that defendant had used marijuana. *Id.* at 110, 381 S.E.2d at 626. Responding to defendant's argument that he was entitled to have submitted the mitigating circumstance of no significant history of prior criminal activity, we stated that a witness's "cursory and unsubstantiated references to past marijuana use" were not substantial evidence so as to entitle defendant to an instruction on the mitigating circumstance of no significant history of prior criminal activity. *Id.* at 111, 381 S.E.2d at 627. Defendant is not entitled to have this mitigating circumstance submitted when the record is silent on the subject or when the references to criminal activity are made not with regard to this mitigating circumstance but in other contexts for other reasons.

We find that references in the instant case to defendant's criminal activity were "cursory and unsubstantiated," and, as we held in *Laws*, defendant was not entitled to the mitigating circumstance at issue. We emphasize that the testimony to which defendant refers was elicited in contexts in which the jury would not have considered it as bearing on the mitigating circumstance at issue here or on defendant's character in any other manner. Evidence pertaining to defendant's blood alcohol level, for example, was elicited by the prosecutor to establish that defendant was generally able to drive and that the accident he was in was caused mostly, if not exclusively, by his alcohol use. Similarly, evidence of defendant's other substance abuse was introduced in the context of showing that defendant would have been mentally impaired at the time of the murder. Also, there was no evidence as to how defendant "lost" his license and the evidence was sparse as to how defendant resisted Officer Wilson during an arrest.

Defendant's assignment of error on this issue is, therefore, overruled.

XI.

[17] Defendant next argues the trial court erred in its instructions to the jury regarding the process by which it was to determine whether defendant should be sentenced to death. The instructions given by the trial court were nearly identical to the pattern jury instructions.

Defendant objected to none of these instructions at trial; our review, therefore, is limited to review for plain error. N.C. R. App. Proc. 10(c)(4).

While instructing the jury on Issue Three, whether the mitigating circumstances found by one or more of the jurors are insufficient to outweigh the aggravating circumstances found, the trial court stated that each juror "may consider any mitigating circumstance or circumstances that the juror determines exists by a preponderance of the evidence in Issue Two." While instructing on Issue Four, whether the aggravating circumstances found are sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstances, the court stated that "each juror may consider any mitigating circumstance or circumstances that the juror determines exists by the preponderance of the evidence."

Defendant contends that these instructions improperly gave the jurors the discretion to disregard a mitigating circumstance found in Issue Two. We rejected this argument in *State v. Jones*, 336 N.C. 229, 250-51, 443 S.E.2d 48, 58, *cert. denied*, —— U.S. ——, —— L. Ed. 2d —— (1994) based on other provisions of the pattern jury instruction which make it clear that a juror is required to consider any mitigating circumstance that juror found to exist in Issue Two. Based on our decision in *Jones* defendant's contention is rejected.

[18] Defendant also argues that the trial court erred by instructing the jury on Issue Two, whether certain submitted mitigating circumstances existed, that the jury "should" consider whether that circumstance existed and that it "would" find that factor if the evidence supported it and if, with respect to non-statutory circumstances, they had mitigating value. Defendant complains the trial court should have instructed the jury it "must" consider the evidence. We find this complaint to be without merit. The clear import of the trial court's instruction was that the jury had a duty to consider each mitigating circumstance submitted, which is a correct statement of law and in no way limited the jury's consideration of evidence. *See Eddings v. Oklahoma*, 455 U.S. 104, 114, 71 L. Ed. 2d 1, 11 (1982) (sentencer may not exclude evidence of mitigation from consideration).

[19] Finally, defendant complains of another instruction by the trial court concerning Issue Two. After instructing the jury on each of the seventeen specific mitigating circumstances submitted, the court stated:

> Finally you may consider any other circumstance or circumstances arising from the evidence which you deem to have mitigating value. If one or more of you so find by a preponderance of the evidence you would so indicate by having your foreman write 'yes' in the space provided after this mitigating circumstance . . . .

We find this statement properly instructed the jury that it should consider other mitigating circumstances where a juror found such mitigators to exist by a preponderance of the evidence. Further, as we found in *Jones*, the jury instructions as a whole clearly stated that the jury had to consider all mitigating circumstances found. *See State v. McNeil*, 327 N.C. 388, 392, 395 S.E.2d 106, 109 (1990), *cert. denied*, 499 U.S. 942, 113 L. Ed. 2d 459 (1991) ("a single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge").

Defendant's assignments of error on this point are therefore without merit.

## XII.

[20] Defendant next argues that the trial court committed plain error in its instruction on the statutory mitigating circumstance that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(6). The trial court instructed the jury:

> Turning to mitigating circumstance Number Two. You should consider whether the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. A person's capacity to appreciate the criminality of his conduct or to conform his conduct to the law is not the same as the ability to know right from wrong generally, or to know that when he was, what he was doing at the given time is killing or that such killing is wrong. A person may indeed know that a killing is wrong and still not appreciate its wrongfulness because he does not fully comprehend or is not fully sensible to what he is doing or how wrong it is. Further, for this mitigating circumstance to exist the Defendant's capacity to appreciate does not need to have been totally obliterated. Finally, this mitigating circumstance would exist even in [sic] the Defendant did appreciate the criminality of his conduct, if his capacity to conform his conduct to the law was impaired since a person may

**STATE v. ROUSE**

[339 N.C. 59 (1994)]

appreciate that this killing is wrong and still lack the capacity to refrain from doing it. Again, the Defendant need not wholly lack all capacity to conform. It is enough that such capacity as he might otherwise have had in the absence of his impairment is lessened or diminished because of such impairments. *You would find this mitigating circumstance if you find that the Defendant suffered from organic personality disorder and/or a mixed personality disorder and had consumed alcohol and cocaine before the killing.* And that this impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. If one or more of you finds by a preponderance of the evidence that the circumstance exists you would so indicate by having your foreman write "yes" in the space provided after this mitigating circumstance on the "Issues and Recommendation" form. If none of you finds this circumstance to exist you would so indicate by having your foreman write "no" in that space. (emphasis added).

The jury rejected this mitigating circumstance.

Defendant contends the trial court erred in instructing the jury that it would have to find the existence of a personality disorder and the consumption of alcohol and cocaine in order to find the mitigating circumstance at issue. We agree the trial court's statement in isolation could be misleading, but it is clearly not plain error.

Where supported by the evidence, a defendant is entitled to have the jury consider the mitigating circumstance that his ability to appreciate the criminality of his conduct or his ability to conform his conduct to the requirements of the law was impaired. While consumption of alcohol or drugs may show impaired capacity, *see, e.g., State v. Johnson*, 317 N.C. 343, 391, 346 S.E.2d 596, 623 (1986), consumption of those substances is not necessary to establish this mitigating circumstance. Indeed, Dr. Rollins testified that his "diagnoses are independent of whether [defendant] was intoxicated that night or not." Thus, to the extent the trial court's statement indicated that defendant had to show both a personality disorder and intoxication to establish this circumstance, it was error.

Defendant did not object to the instruction at trial, however, and thus he was waived his right to raise this issue on appeal unless he can show "plain error." N.C. R. App. Proc. 10(c)(4). Plain error is an error so fundamental that it probably affected the outcome. Defendant cannot meet this burden.

STATE v. ROUSE

[339 N.C. 59 (1994)]

The entire jury instruction quoted above, absent the one sentence of which defendant now complains, was an accurate and extremely thorough recitation of the law regarding the mitigating circumstance of impaired capacity. Also, the sentence at issue here from the trial court's instruction did not state that the *only* way defendant could establish the mitigator was by proving both a personality disorder and intoxication. The entire instruction was subject to the interpretation that the jury did not have to find both a personality disorder and intoxication, notwithstanding the one misleading sentence. This lessens the likelihood that the misleading sentence affected the jury's decision.

Further, one or more jurors did find the mitigating circumstance that the "murder was committed while the defendant was under the influence of a mental or emotional disturbance." While this circumstance is not the same as the mitigating circumstance relating to impaired capacity, *State v. Greene*, 329 N.C. 771, 776, 408 S.E.2d 185, 187 (1991), it nevertheless permits the jury to consider the effect of the defendant's emotional disturbances. One or more juror also found the mitigator that "Defendant has suffered from a history of depression."

In deciding the effect of the trial court's instruction on the jury we also must consider the brutality of the killing inflicted upon Hazel Broadway. The jury saw and heard evidence relating to the numerous stab wounds and bruises received by Broadway. It also heard evidence that Broadway lived for as long as fifteen minutes in severe pain. The jury found as an aggravating factor that the murder was especially heinous, atrocious or cruel.

In light of the trial court's entire instruction regarding defendant's impaired capacity, the jury's finding that defendant was under the influence of an emotional disturbance, and the brutality of the killing, we conclude the error in one sentence of the trial court's instruction had no probable effect on the outcome of the sentencing proceeding. Defendant's assignment of error is, therefore, overruled.

XIII.

[21] Defendant next argues the trial court committed plain error in instructing the jury regarding the mitigating circumstance of defendant's age. The court stated:

Turning now to mitigating circumstance Number Three. You should consider whether the age of this Defendant at the time of

this murder is a mitigating factor. The mitigating effect of the age of the Defendant is for you to determine from all the facts and circumstances which you find from the evidence. If one or more of you finds by a preponderance of the evidence that the circumstance exists you would so indicate by having your foreman write "yes" in the space provided after this mitigating circumstance on the "Issues and Recommendation" form. If none of you finds this circumstance to exist you would so indicate by having your foreman write "no" in that space.

Defendant argues this instruction impermissibly allowed the jury to accord defendant's age, which is enumerated at N.C.G.S. § 15A-2000(f)(7) as a mitigating circumstance, no mitigating value.

In *State v. Kirkley*, 308 N.C. 196, 220, 302 S.E.2d 144, 158 (1983), *overruled on other grounds*, *State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988), we held that a statutory mitigating circumstance, if found, must be given some weight. *See State v. Greene*, 329 N.C. 771, 776, 408 S.E.2d 185, 187 (1991). The mitigating circumstance of defendant's age is not determined by defendant's chronological age, but rather it must be determined in light of "varying conditions and circumstances." *State v. Johnson*, 317 N.C. 343, 393, 346 S.E.2d 596, 624 (1986). With respect to this statutory mitigating circumstance, the defendant is not entitled to an instruction until he makes a threshhold showing that his age could have some mitigating value. *See id.* (trial court did not err in refusing to submit mitigating circumstance of age where defendant was twenty-three and his foster parents testified that he was emotionally immature). Simply being entitled to submission of the mitigating circumstance, however, does not require the jury to find that circumstance to exist. Unless a defendant's age has mitigating value as a matter of law, a juror need consider the defendant's age as mitigating only if that juror finds by a preponderance of the evidence that his age has mitigating value. It would make no sense, as defendant seems to propose, that a defendant's age is always to be afforded some mitigating value.

The evidence showed that defendant was twenty-eight. There was also substantial evidence that defendant suffered serious mental problems. Defendant's IQ was between 70 and 80 and various tests ranked defendant from the fifth to the ninth percentile as compared to those in his age group. Defendant was diagnosed with organic personality disorder, mixed personality disorder, borderline intellectual functioning, and major, recurrent depression. There was also evi-

dence, however, that while in school defendant's articulation, language, fluency and voice were within normal ranges, and overall defendant was in a "low average" group. A report relied on by Dr. Rollins revealed that in 1987 defendant "was a grown man and could make his own decisions, was working full time, was doing well, and had his own apartment." A co-worker and a supervisor testified that defendant performed well in his job as a "take-up operator." A cellmate testified that defendant exercised, played chess, and read "just like everybody else."

In light of this evidence which is contradictory as to whether defendant's age has mitigating value, the jurors were properly instructed that it was within their province to determine whether defendant's age had mitigating value. Defendant's assignment is, therefore, overruled.

## XIV.

Defendant next argues that he is entitled to a new sentencing hearing because the jury failed to find certain statutory and non-statutory mitigating circumstances for which he claims there was substantial, credible, and uncontradicted evidence. In particular, defendant points to the statutory mitigating circumstances of impaired capacity and "age" and to the following non-statutory mitigating circumstances: He suffered a learning disability; he had a borderline intellectual function; he suffered various head injuries from various accidents; as a child he observed verbal and physical abuse of his mother by his father; and his father is an alcoholic.

[22] Whether the jury finds a non-statutory mitigating circumstance depends not only upon whether that circumstance is supported by the evidence, but also upon whether the jury determines that circumstance to have mitigating value. *State v. Huff*, 325 N.C. 1, 59, 381 S.E.2d 635, 669 (1989), *sentence vacated*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990), *in light of McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). Since the jury was free to reject any of the non-statutory mitigating circumstances submitted on the basis that they had no mitigating value, defendant is not entitled to a new sentencing proceeding on the basis of the jury's rejection of these mitigating circumstances. Since we have held earlier in this opinion that whether defendant's age has mitigating value is for the jury, the jury was free to reject this mitigating circumstance on that basis.

**[23]** The evidence supporting the impaired capacity mitigating circumstance, which consisted of the testimony of Dr. Conder and Dr. Rollins, was uncontroverted and unchallenged. This evidence, if believed, would have supported the jury's finding that the circumstance existed. We conclude, nevertheless, that the jury was free to reject this circumstance because it did not find the evidence of the mental experts credible or convincing. *See State v. Gay*, 334 N.C. 467, 492, 434 S.E.2d 840, 854 (1993) (where defendant entitled to a peremptory instruction on a mitigating circumstance because the evidence supporting it is uncontradicted, the jury "may still reject that circumstance on the basis that the supporting evidence was not convincing"); *State v. Huff*, 325 N.C. 1, 59, 381 S.E.2d 635, 669 ("peremptory instruction does not deprive jury of its right to reject the evidence in question because of a lack of faith in its credibility").

Defendant contends that where evidence of a statutory mitigating circumstance is uncontradicted and inherently credible the jury simply may not be permitted to reject it. He relies on language in *State v. Kirkley*, 308 N.C. 196, 302 S.E.2d 144 (1983). There the Court said:

allowing the jury the discretionary power to completely disregard a statutory mitigating factor proven by the evidence would return the final sentencing procedure to the realm of unguided decision making which is prohibited under *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L. Ed. 2d 346 (1972).

. . . .

[W]hen a mitigating factor is uncontroverted the trial judge must give a peremptory instruction to the jury on that circumstance. The effect of this type of instruction is to remove the question of whether the mitigating circumstance exists from the jury's determination and to conclusively establish the existence of that factor.

*Id.* at 220, 302 S.E.2d at 158.

As our later cases like *Huff* and *Gay* explain, even when the defendant is entitled to a peremptory instruction on a given mitigating circumstance because the evidence on that circumstance is uncontroverted, the jury is still free to reject the circumstance on the ground that it does not find the evidence credible or convincing. The language in *Kirkley* insofar as it applies to peremptory instructions and is inconsistent with these later rulings is disapproved. Neither do we find anything in the United States Supreme Court's or this Court's

death penalty jurisprudence which mandates that the sentencing jury accept the existence of any particular mitigating circumstance, statutory or otherwise, because the evidence in support of that circumstance is uncontradicted. The United States Supreme Court cases and our cases require merely that the sentencing jury not be precluded from considering evidence which may have mitigating value. *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1 (1982) (capital sentencer may not refuse to consider relevant mitigating evidence); *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed 2d 973 (1978) (capital sentencer may "not be precluded from considering as a *mitigating factor* . . . [any evidence which] the defendant proffers as a basis less than death"). As to non-statutory mitigating circumstances, "neither *Lockett* nor *Eddings* requires that the sentencer must determine that the submitted mitigating circumstance has mitigating value." *State v. Fullwood*, 323 N.C. 371, 396, 373 S.E.2d 518, 533 (1988), *judgment vacated*, 494 U.S. 1022, 108 L. Ed. 2d 602, *in light of McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). As to statutory mitigating circumstances, the jury is free to disbelieve the evidence or to conclude that the evidence is not convincing. *See Gay*, 334 N.C. at 492, 434 S.E.2d at 854; *State v. Huff*, 325 N.C. at 59, 381 S.E.2d at 669.

[24] We do not mean to foreclose the possibility that a defendant may be entitled to a *directed verdict* on a given statutory mitigating circumstance if the evidence in support of the circumstance is substantial, manifestly credible and uncontradicted. Insofar as the language in *Kirkley* describes a directed verdict, *Kirkley* is correct. Suffice it to say here that defendant's evidence did not rise to that level. *See State v. McCollum*, 334 N.C. 208, 229, 433 S.E.2d 144, 155 (1993).

In *McCollum* the defendant argued that his due process rights were violated when the jury failed to find the impaired capacity mitigating circumstance. We overruled this assignment, stating:

It is well settled that a peremptory instruction does not deprive the jury of its right to reject the evidence because of a lack of faith in its credibility. *State v. Johnson*, 298 N.C. 47, 257 S.E.2d 597 (1979). In the present case, the defendant relied upon the testimony of [his mental health expert] to support the submission of the mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired at the time the victim was killed. Contrary to the defendant's contention, the jury was not required to accept [his expert's] testi-

mony. *See id.* Even though Dr. Sultan's testimony was uncontradicted, we cannot say, in light of the fact that she did not examine the defendant until seven years after the killing, that her testimony was manifestly credible. Accordingly, this assignment of error is without merit.

*McCollum*, 334 N.C. at 229, 433 S.E.2d at 155.

Thus, defendant's assignment of error is rejected.

<u>Review Under N.C.G.S. § 15A-2000(d)(2)</u>

XV.

Finally, we must determine whether the aggravating circumstances are supported by the record, whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the "sentence of death is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

The jury found as aggravating circumstances that the "murder was committed by the defendant while the defendant was engaged in the commission of or attempting to commit Robbery With A Dangerous Weapon and attempting to commit First Degree Rape" and that the murder was especially heinous, atrocious or cruel. As discussed earlier in this opinion, we find these aggravating circumstances to be supported by the record.

Also, we find nothing in the record indicating that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

[25] Our final inquiry is whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant. In making this comparison, we look at:

all cases arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by the Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78

L. Ed. 2d 704 (1983). "Only cases found to be free of error in both the guilt-innocence and penalty phases are included in the pool." *State v. Moore*, 335 N.C. 567, 614, 440 S.E.2d 797, 824, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 174, *reh'g denied*, —— U.S. ——, —— L. Ed. 2d —— (1994). *See also State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994) (elaborating on composition of proportionality pool).

In making the inquiry into proportionality,

this Court will not necessarily feel bound during its proportionality review to give a citation to every case in the pool of "similar cases" used for comparison . . . . The Bar may safely assume that we are aware of our own opinions filed in capital cases arising since the effective date of our capital punishment statute, 1 June 1977.

*Williams*, 308 N.C. at 81-82, 301 S.E.2d at 356.

In the case· *sub judice* the jury found as aggravating circumstances warranting the imposition of death that the murder was especially heinous, atrocious or cruel and that the murder was committed during the commission of the felonies of attempted rape and attempted armed robbery. The murder of Hazel Broadway is thus especially marked by its brutality and by the intense suffering it must have caused her. It is also characterized by the attempted rape of Hazel Broadway and attempted armed robbery.

The jury found as mitigating circumstances that the murder was committed while defendant was under the influence of a mental or emotional disturbance, that defendant suffered from a history of depression, that upon arrest defendant cooperated with law enforcement officers to the extent of physically responding to their directives, that defendant was identified as "different" by acquaintances and was often the object of teasing and joking, and the catch-all circumstance of any other circumstance deemed to have mitigating value.

This Court has found the death penalty disproportionate on seven occasions.[6] None of those cases, however, are comparable to the case

_____

6. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds, State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 25, 305 S.E.2d 703 (1983).

at hand since they did not involve the level of brutality inflicted upon Hazel Broadway. Of the seven, in only two, *Bondurant* and *Stokes*, did the jury find the aggravating circumstance that the murder was "especially heinous, atrocious or cruel." In *Bondurant*, however, the Court emphasized that the killing, which consisted of one gunshot wound to the head, was not "torturous." 309 N.C. 674, 677, 693, 309 S.E.2d 170, 173, 182 (1983). Further, there was "substantial evidence" that the defendant was intoxicated, and the defendant immediately sought medical attention for his victim. *Id.* at 693-94, 309 S.E.2d at .182. In *Stokes* the victim suffered numerous head injuries, but they do not rise to the level of injuries inflicted upon Broadway. 319 N.C. 1, 3, 352 S.E.2d 653, 654 (1987). Further, in *Stokes* the Court emphasized that the defendant was found guilty of first-degree murder only on the basis of felony murder and that the defendant was seventeen. *Id.* at 21, 24, 319 S.E.2d at 664, 666.

We find that the case at hand more closely resembles cases in which we have affirmed a sentence of death. In *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983), for example, we affirmed a sentence of death. In *McDougall*, the defendant stabbed his victim numerous times with a butcher knife and caused her several bruises. The victim lost nearly half of her blood and died. There was evidence that McDougall sexually assaulted the victim. McDougall introduced evidence that he suffered from mental problems including depression and organic brain damage and that he suffered traumatic experiences as a child. The jury found that he was under the influence of a mental or emotional disturbance at the time of the murder and that his capacity to appreciate the criminality of his conduct was impaired. It also found that the murder was especially heinous, atrocious or cruel; that McDougall had previously been convicted of a felony involving violence; and that the murder was part of a course of conduct which included a crime of violence against another person.

The killing in this case is likewise similar to other cases in the proportionality pool in which we affirmed a sentence of death. *See State v. McNeil*, 324 N.C. 33, 38, 61, 395 S.E.2d 106, 112, 125-26 (1989) (defendant stabbed victim, in addition to inflicting numerous other injuries, resulting in her death; defendant presented evidence of diminished capacity); *State v. Vereen*, 312 N.C. 499, 504, 324 S.E.2d 250, 254, *cert. denied*, 471 U.S. 1094, 85 L. Ed. 2d 526 (1985) (defendant stabbed seventy-two-year-old victim several times with steak knife and pocket knife, inflicted numerous bruises and fractures,

attempted to rape her, and stole her pocketbook); *State v. Rook,* 304 N.C. 201, 236, 283 S.E.2d 732, 753 (1981), *cert. denied,* 455 U.S. 1038, 72 L. Ed. 2d 155 (1982) (defendant cut victim with knife, beat her, raped her, ran over her with his car and left victim to bleed to death; defendant introduced evidence of emotional disturbance, impaired capacity, and that he had a troubled childhood); *State v. Smith,* 305 N.C. 691, 711-12, 292 S.E.2d 264, 276-77, *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied, Williams v. North Carolina,* 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983) (defendant raped victim and inflicted upon her numerous lacerations, bruises and fractured several ribs; victim died of head injuries; defendant presented evidence of emotional disturbance and impaired capacity).

Defendant refers us to the following four first-degree murder cases involving sexual assaults in which the juries returned sentences of life imprisonment: *State v. McKinnon,* 328 N.C. 668, 403 S.E.2d 474 (1991); *State v. Harris,* 319 N.C. 383, 354 S.E.2d 222 (1987); *State v. Fincher,* 309 N.C. 1, 305 S.E.2d 685 (1983); *State v. Franklin,* 308 N.C. 682, 304 S.E.2d 579 (1983), *overruled on other grounds, State v. Parker,* 315 N.C. 222, 337 S.E.2d 487 (1985); *State v. Powell,* 299 N.C. 95, 261 S.E.2d 114 (1980). In each of those cases, however, the defendant was found guilty of first-degree murder on the basis of felony murder only. Defendant in this case was found guilty of first-degree murder based on felony murder and also on premeditation and deliberation.

Defendant also refers us to *State v. Williams,* 308 N.C. 47, 301 S.E.2d 335 (1983), which was reversed on *McKoy* error in *Williams v. Dixon,* 961 F.2d 448 (4th Cir.), *cert. denied,* —— U.S. ——, 121 L. Ed. 2d 445 (1992). On retrial, Williams was sentenced to life imprisonment, and thus *Williams* is in the proportionality pool as a life case. *See State v. Bacon,* 337 N.C. at 107 n.6, 446 S.E.2d at 564 n.6 (1994). In *Williams,* the defendant was convicted of first-degree murder based on premeditation and deliberation and on felony murder, with the underlying felonies being first-degree burglary and first-degree sex offense. Williams had entered the home of his one-hundred-year-old victim, taken items from her house, and beaten her severely, causing multiple lacerations and fractures. The evidence also indicated that defendant had inserted a mop into her vagina, causing severe internal injuries. Finally, Williams left his victim "to die in a pool of her own blood."

This Court in *Williams* described the defendant's actions as "torture" and as a "vicious and prolonged murderous assault." 308 N.C. at 82, 301 S.E.2d at 357. We still agree with those characterizations

notwithstanding the jury's sentence of life imprisonment at retrial. Nevertheless, the presence in our proportionality pool of one vicious murder resulting in a sentence of life imprisonment does not preclude other defendants committing murders with similar levels of brutality from receiving the death penalty. Since a jury's decision whether a defendant should receive the death penalty is the product of a delicate and subjective balancing process, it is not surprising that there is some apparent inconsistency within the pool. Our task in reviewing for proportionality, however, is not to require precise consistency among jury verdicts but instead to compare the case at hand with those in the pool to determine whether the sentence of death is disproportionate looking to all cases in the pool. Making that inquiry here, we are convinced that a sentence of death is not disproportionate considering the numerous death cases in our pool involving defendants and murders similar to the defendant here and the murder he committed upon Hazel Broadway.

After comparing this case with other cases in the proportionality pool, focusing on the defendant and the crime, we conclude that the sentence of death is neither excessive nor disproportionate. N.C.G.S. § 15A-2000(d)(2).

## Preservation Issues

## XVI.

Defendant also raises seven issues which he concedes have previously been decided by this court against him.[7]

We have considered defendant's arguments on these issues and find no reason to depart from our prior holdings. We therefore overrule these assignments of error.

---

7. These issues are (i) whether it was error to deny defendant's motion for a bill of particulars to require the State to designate whether it would rely on felony murder or on premeditation and deliberation to support first-degree murder, (ii) whether it was plain error to permit the prosecutor to state that the jury had a "duty" to impose a sentence of death if it found that the evidence in mitigation was insufficient to outweigh the aggravating circumstances, (iii) whether it was error to deny defendant's motion for a mistrial on the ground that the State had peremptorily challenged jurors who expressed doubts about the death penalty but who ultimately answered that they could recommend death, (iv) whether the trial court erred in instructing the jury that its sentence was a "recommendation" of punishment, (v) whether the North Carolina Capital Sentencing Act is unconstitutional, (vi) whether the trial court committed plain error by instructing on "especially heinous, atrocious or cruel" in accord with the pattern jury instruction, and (vii) whether the trial court erred by instructing the jury that it must not consider any non-statutory mitigating circumstance unless the jury deemed that circumstance to have mitigating value.

Conclusion

We hold that defendant received a fair trial and sentencing proceeding, free from prejudicial error. The death sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor. The death sentence imposed is not disproportionate to the death penalty imposed in similar cases.

NO ERROR.

Justice MEYER concurs in the result.